UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KRISTA B. NORMAN,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:24-CV-57 JD |

**OPINION AND ORDER**

Plaintiff Krista Norman appeals the denial of her claims for supplemental security income under Title XVI of the Social Security Act. For the reasons below, the Court will remand this case to the Agency for additional consideration.

**A. Background**

Ms. Norman applied to the Social Security Administration for supplemental security income benefits, alleging that she became disabled in 2021. Ms. Norman's claims were rejected, leading to a review by an Administrative Law Judge ("ALJ").

After holding a hearing and receiving testimony from Ms. Norman and the vocational expert ("VE"), and reviewing the medical record, the ALJ found that she has the following severe impairments: "degenerative disc disease of the spine aggravated by motor vehicle accident in March 2023 causing some fractures in the cervical vertebra; chronic obstructive pulmonary disease (COPD)/emphysema with a history of smoking; depression/bipolar disorder; anxiety/panic attacks; and post-traumatic stress disorder (PTSD)." (R. at 25.) The ALJ

determined that none of the impairments, alone or combined with each other, meets or medically equals the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ next found that, despite Ms. Norman's severe impairments, she retained the residual functional capacity ("RFC")[1] to perform light work.[2] The ALJ incorporated that RFC into the hypothetical person question to the VE, who opined that, even with her limitations, Ms. Norman could still work as a collator operator, a routing clerk, and a price marker. The VE estimated that there were 33,000, 25,000, and 137,000 of these jobs in the national economy, respectively. (R. at 75.)

The ALJ asked the VE if those jobs were consistent with the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations ("SCO"):

> Q. . . . And are those jobs you said consistent with the description of the DOT and in the SCO?
>
> A. Those publications do not specifically mention the use of ladders, ropes, scaffolds, ramps or stairs, frequency of changes, the specific rate of pace and jobs as well as the type and frequency of interaction with certain individuals in the work environment. So these opinions do come from my education, training, and experience as a vocational expert. The rest of the testimony has been consistent, Your Honor.

(R. at 75–76.) At no point in her testimony did the VE specify how her education, training, and experience as a vocation expert informed her decision.

---

[1] "The RFC reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

Ms. Norman's attorney had a chance to cross-examine the VE. As relevant here, he asked the VE about her methodology in deciding how many specific jobs existed in the economy. Here's the VE's response:

> Q. [W]hat methodology do you use to get from the bureau labor district [numbers] to the national [numbers] for job classification?
>
> A. The BLS or the Bureau of Labor [Statistics] does not collect employment data using a DOT code. So I utilize information from the Occupational Employment Statistics Study in combination with the SkillTran program. The OES survey collects data using the standard occupational system or the SOC coding system. Those codes that coding system groups occupations in larger groups. Those groups contain a number of different DOT codes at varying skill and exertional levels. So the SkillTran program looks at the DOT code and what kind of industries that DOT code is likely to be employed in. And then they look at the percentage of the group number coming from that industry to extrapolate a number. If more than one DOT code is likely to be employed in a certain industry, equal distribution will be used at that industry level to further break the estimation down.

(R. at 77–78.) After this answer, the attorney asked no further questions, stating a one-sentence objection instead:

> Your honor, I would object to the numbers testified to by the VE on the basis that they're unreliable and [the] result of unreliable methodology. Thank you.

(R. at 78.) The ALJ was unresponsive, failing to even acknowledge what he just heard:

> Okay. Well, Ms. Norman, what I have to do, I have to consider what you told me today. I want to go through the record, make sure I have everything in mind before I make a final decision in your claim. And then once I do, [it'll] be put in a written decision and then it'll be sent in the mail, okay?

(*Id.*) With that, the hearing ended. (*Id.*)

In his decision, the ALJ adopted the VE's testimony regarding available jobs and their prevalence in the country, finding Ms. Norman "not disabled":

> Pursuant to SSR 00-4p, the undersigned determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The opinions provided outside of the Dictionary of Occupational Titles are indicated to be based upon professional experience, including job analyses, and are accepted as both competent and credible. The

3

> testimony is also deemed to be both competent and credible with respect to the number of representative occupations as it is a conservative estimate of occupations reported by the Department of Labor, Bureau of Labor Statistics, with characteristics that fit within the above-stated residual functional capacity.
>
> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is, therefore, appropriate under the framework of the above-cited rule.

(R. at 33.)

After the Appeals Council denied Ms. Norman's request for review of the ALJ's decision, she appealed to this Court.

**B.    Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

## C. Standard for Disability

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;

   3. Whether the claimant's impairment meets or equals one listed in the regulations;

   4. Whether the claimant can still perform past relevant work; and

   5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## D.  Discussion

In her appeal, Ms. Norman argues that the ALJ failed to ensure the accuracy and reliability of the VE's methodology in determining whether jobs suitable for Ms. Norman exist in significant numbers in the national economy. According to Ms. Norman, the ALJ's Step 5

finding is not supported by substantial evidence because it is based on unreliable VE testimony. In particular, Ms. Norman challenges the VE's reliance on the "equal distribution" principle in calculating the number of jobs. The Commissioner acknowledges that the VE referred to equal distribution in describing her method but insists that her testimony reflects other grounds for her opinion as well. The Commissioner also maintains that Ms. Norman's attorney's objection was too vague to alert the ALJ that additional information as to the VE's methodology was needed.

At Step 5, an ALJ has the burden to show with substantial evidence the jobs that a claimant can do exist in significant numbers. *See Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018). In this task,

> ALJs commonly rely on vocational experts to provide "an impartial assessment" of the (1) types of occupations in which claimants can work and (2) availability of positions in such occupations. Vocational experts are experienced in job placement and typically hold advanced degrees in vocational rehabilitation or psychology. To make their assessment, vocational experts may rely on a variety of sources and tools, as well as their knowledge of the job market, experience placing individuals in jobs, and surveys of employers.

*Chavez v. O'Malley*, 96 F.4th 1016, 1021 (7th Cir. 2024) (citations and quotation marks omitted).

An ALJ must ensure that the VE's jobs estimate is the product of a reliable method and that the VE gave enough detail for the Court to understand the sources of his data and the general process he adopted:

> When an ALJ bases a decision on the testimony of a vocational expert, the substantial evidence standard requires the ALJ to ensure that the vocational expert's job number estimate is the product of a reliable method. A precise count is not necessary, but the vocational expert's testimony must be supported with evidence sufficient to provide some modicum of confidence in its reliability. All the substantial evidence standard requires is that a vocational expert gave enough detail for the Court to understand the sources of his data and the general process he adopted.

7

*Id.* at 1022. The ALJ's duty to ascertain that the VE's numbers are not made out of whole cloth is particularly true when the claimant's attorney objects to the VE's testimony. *See Chavez v. Berryhill*, 895 F.3d 962, 970 (7th Cir. 2018) ("Before accepting a VE's job-number estimate, the ALJ, when confronted by a claimant's challenge, must require the VE to offer a reasoned and principled explanation.").[3]

"This case-by-case inquiry considers all features of the vocational expert's testimony to determine whether the testimony establishes more than a mere scintilla of evidence supporting the ALJ's conclusion. . . . But a critical aspect of the vocational expert's job estimation process is how that expert matches general economic data reported in SOC codes to specific DOT numbers used by the agency." *Id*. (citations, quotation marks, and brackets omitted). "The database does not list the number of jobs associated with each job title, so the vocational expert must perform an estimate. Because the database of job titles is so outdated, an expert's methodology for connecting job titles to reliable estimates of the number of jobs for each title is especially important. The Social Security Administration has itself acknowledged this issue and expressed an intent to update the database, but the new version has not yet arrived." *Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

If a claimant believes that the VE's testimony contradicts the law, she must object at the time of the hearing. *See Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) ("But she forfeited this argument by failing to object to the VE's testimony during the hearing."). "[A] claimant must object to the VE's testimony or otherwise indicate that the testimony is unreliable during the administrative hearing (or after, in a posthearing brief) to preserve his objection. The

---

[3] In this order, there are two *Chavez* opinions cited. To allow for easier differentiation, the Court cites them in full each time.

claimant's objections, we emphasized, must also be specific enough to indicate that [the claimant] believed the methodology was unreliable. General objections or vague questions about the VE's methodology are, without more, insufficient." *Leisgang v. Kijakazi*, 72 F.4th 216, 219–20 (7th Cir. 2023) (citations and quotation marks omitted). The Court of Appeals for the Seventh Circuit is quick to emphasize that these forfeiture rules "did not displace the ALJ's duty to hold the VE to account for the reliability of his job-numbers estimates . . . or the general rule that a claimant cannot waive the substantial evidence standard," and did not shift the burden of proof away from the agency. *Id*. at 220.

After posing a question to the VE about the VE's methodology with respect to the job estimates, Ms. Norman's attorney objected, stating that the VE's numbers were "unreliable and [the] result of unreliable methodology." (R. at 78.) This should have put the ALJ on alert that additional clarifications were needed for the VE's job-numbers conclusions. Instead, the ALJ ended the hearing.[4]

> A VE may use a variety of sources to estimate jobs. One such source is the Dictionary of Occupational Titles (DOT), which "lists job titles and their requirements" but "does not estimate how many positions exist in the national economy for each job title." [*Ruenger v. Kijakazi*, 23 F.4th 760, 761–62 (7th Cir. 2022)]. Because the DOT does not estimate job numbers, VEs typically rely on the Department of Labor's Occupational Employment Survey's listed job-number estimates. *Id*. 762. The job-number estimates are not organized by DOT job titles but by the "standard occupational classification" (SOC) system. *Id*. The SOC sorts jobs into "broad occupational categories" that encompass multiple DOT titles. *Id*. To determine the number of individual DOT job titles within an SOC grouping, VEs sometimes rely on the OEQ. The OEQ "estimates the number of jobs available in the national economy for each DOT job title" through the equal distribution method. *Id*. The equal distribution method is a calculation that "divides the number of jobs estimated for an SOC code by the number of DOT titles contained within that SOC code. *Id*. The Seventh Circuit has "repeatedly questioned the accuracy of the equal distribution method because it illogically assumes that each DOT job title

---

[4] The Commissioner does not challenge the propriety of the objection. Rather, the Commissioner argues that the ALJ implicitly overruled the objection in his decision when he found the VE's testimony to be both competent and credible.

9

within an SOC code exists in equal numbers in the national economy." *Id*. (citing Chavez, 895 F.3d at 966).

*Seefeldt v. O'Malley*, No. 22-C-1546, 2024 U.S. Dist. LEXIS 21222, at *11-12 (E.D. Wis. Feb. 7, 2024).

Here, the Court can trace the path that the VE took in arriving at her job-numbers conclusions, but the modicum of its reliability is lacking. The VE's testimony implies that her findings may have been ultimately based on data derived from the equal distribution method. The VE testified that she uses information from the Occupational Employment Statistics Study in combination with the SkillTran program. She explained that the SkillTran program looks at the DOT code and extrapolates a number of jobs available in an industry, but if more than one code is likely to appear in a certain industry, "equal distribution will be used at that industry level to further break the estimation down." (R. 77–78.) The VE's explanation of the methodology was generalized, and she did not specify at what point she determined the job numbers in Ms. Norman's case, so the Court cannot rule out her reliance on data derived through equal distribution technique.[5] Yet, this method is highly suspect in the Seventh Circuit, although not categorically banned. *Jenich v. Kijakazi*, No. 21-C-425, 2022 U.S. Dist. LEXIS 151848, at *5 (E.D. Wis. Aug. 24, 2022) ("It's clear that the equal distribution method, standing on its own,

---

[5] The Commissioner argues that Ms. Norman's attorney's objection "did not merit a deeper dive from the ALJ into her methodology" concerning equal distribution. Likening this case to *Leisgang*, 72 F.4th 216, the Commissioner insists that the objection was too tenuous to inform the ALJ that Ms. Norman was challenging the VE's reliance on job numbers derived through equal distribution. (Def.'s Resp. Br., DE 24 at 7.) But *Leisgang* is readily distinguishable. There, the plaintiff's "attorney asked the VE how he came up with his job-number estimates" and whether "the VE believed the equal distribution method was reliable." *Id.* at 219. The attorney "never objected to the VE's methodology, either during the hearing or after. Nor did he offer anything (by way of argument or evidence) to suggest the VE's methodology might be unreliable." *Id*. Under those circumstances, there was no hint that the VE's methodology might be problematic. Yet, in Ms. Norman's case, the objection, while not elaborate, was sufficiently specific, indicating that her attorney was challenging the job numbers and the methodology: "Your honor, I would object to the numbers testified to by the VE on the basis that they're unreliable and [the] result of unreliable methodology." (R. at 78.) Moreover, this objection followed the VE's description of how she estimated the job numbers, with her very last words being that "[i]f more than one DOT code is likely to be employed in a certain industry, equal distribution will be used at that industry to further break the estimation down." (*Id*.)

would not suffice to produce a reliable job estimate. The VE must explain why, in this specific case, it would be reasonable to use [the equal distribution] method as a rough way to estimate job numbers."). Faced with the objection, the ALJ could have drawn out from the VE another basis supporting her findings. "The VE, for example, could have drawn on his past experience with the equal distribution method, knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region, to offer an informed view on the reasonableness of his estimates." *Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018). None of this happened here.

At most, the ALJ provided her resume and summarily stated that her opinions came "from [her] education, training, and experience as a vocational expert," but did not explicitly connect these qualifications to her application of the equal distribution method. *See Rennaker v. Saul*, 820 F. App'x 474, 479 (7th Cir. 2020) ("Although the VE pointed to his own education, research, training, and experience in job placement and vocational rehabilitation to explain the kind of work [the plaintiff] could perform, the VE did not explicitly tie this background to his estimate of nationwide job numbers. In other words, although a VE may draw from his expertise to provide a reasoned basis for his job-number estimates, the VE in this case did not bring any aspect of his experience to bear on the reliability of those numbers. He did not say why he thought his numbers were reliable.") (citation omitted); *cf. Hohman v. Kijakazi*, 72 F.4th 248, 254 (7th Cir. 2023) ("A VE who, as here, provides a reasoned explanation based on hands-on experience working in the field, market surveys, or conversations with employers, can establish sufficient confidence in his job-number estimates even though the claimant may not be able to exactly duplicate them"). Also "the VE did not justify her choice of determining job-number estimates by 'drawing on her past experiences with the method, or explain how this method is

11

'well-accepted.'" *Seefeldt*, 2024 U.S. Dist. LEXIS 21222, at *14 (quoting *Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018) and *Brace*, 970 F.3d at 822). Nor did the VE indicate whether she has knowledge of national or local job markets, or practical learning from assisting people with locating jobs throughout the region. "The absence of any such testimony left the ALJ without any reasoned and principled basis for accepting the job-number estimates." *Chavez v. Berryhill*, 895 F.3d 962, 969 (7th Cir. 2018). On this record, the VE's testimony lacks the support of substantial evidence.

This case contrasts with *Jenich*, 2022 U.S. Dist. LEXIS 151848, where the ALJ determined whether other grounds also supported the VE's job-numbers conclusion:

> Here, the ALJ questioned the VE about his methods, clarifying that the VE used proportional distribution for the ink printer and hand mounter jobs, and equal distribution for the document preparer job. The ALJ then asked, "why do you find the numbers that you cited . . . to be reliable? What in your experience allows you to make that conclusion?" The VE answered that his conclusions were based on SkillTRAN "and my experience," as well as "the positions [as] I've observed them in the Tri-State area of Ohio, West Virginia and Pennsylvania. And I know these jobs exist in several regions of the national economy." When pressed by counsel as to how he could extrapolate these jobs to the rest of the economy, the VE explained that "I only use jobs that are readily available in all regions of the country," based on his "research and experience."

*Id.* at *5–6 (citations to the record omitted)

In arguing that the VE's opinion is substantial evidence for the ALJ's decision that Ms. Norman is not disabled, the Commissioner ignores that more is needed than the VE explaining the path for his conclusion; namely, the VE must show that the data can be reasonably relied on. Also, it's not enough to say that the estimates are reliable because they're "conservative." *Brace*, 970 F.3d at 823 ("An unreliable job-number estimate cannot be considered reliable merely because it is large."); *cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595

12

(1993) (in assessing evidentiary reliability, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate").

Accordingly, the Court remands this case to allow the VE "to expand on her testimony or make some other showing that significant jobs exist for [Ms. Norman]. [Ms. Norman] in turn will have the opportunity to challenge any such showing." *Ruenger*, 23 F.4th at 764.

### E. Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: March 24, 2025

/s/ JON E. DEGUILIO
Judge
United States District Court